IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF TEXAS
MARSHALL DIVISION

| | |
|---|---|
| ALEXSAM, INC., § | |
| Plaintiffs, § | |
| § | |
| v. § | CIVIL ACTION NO. 2-07-cv-420-TJW |
| § | |
| IDT CORP., § | |
| Defendant. § | |
| § | |
| § | |

**MEMORANDUM OPINION AND ORDER**

The Court held a *Markman* hearing on June 2, 2010. After considering the submissions and the arguments of counsel, the Court issues the following order regarding claim construction:

**I.    Background**

Plaintiff Alexsam, Inc. ("Alexsam") filed this lawsuit against defendant IDT Corporation ("IDT") alleging infringement of U.S. Patent Nos. 6,000,608 ("the '608 Patent") and 6,189,787 ("the '178 patent").[1] The '787 patent is a continuation of the '609 patent. Alexsam has asserted claims 1, 4, 34, 36, 37, 38, 50, 57, 58, and 60 of the '608 patent against IDT and claims 14 and 23 of the '787 patent. IDT is a provider of wholesale and resale long distance services, including pre-paid long distance calling cards. Alexsam is a patent holding company.

The asserted patents have been previously litigated before this Court, in *Alexsam, Inc. v. Datastream Card Services Limited*, Cause No. 2:03-CV-337 and *Alexsam v. Evolution Benefits*, Cause No. 2:07-cv-288. In an order dated June 10, 2005 ("Datastream Markman Order"), this Court construed a total of thirty-five limitations of the asserted patents. In an order dated August 28, 2009 ("Humana Markman Order"), the Court construed five limitations. The parties have

---

[1] Alexsam has two other cases pending before this Court that involve the '608 patent. *See Alexsam, Inc. v. Unitedhealth Group, Inc.*, 2:07-cv-00512; *Alexsam, Inc. v. Shell Oil Co.*, Cause Number 2:08-cv-15.

agreed to adopt the Court's constructions from the prior orders for some of the terms at issue in this case. Alexsam asks the Court to reconsider its prior claim construction with regard to three of the terms in dispute. IDT asks the Court to reconsider seven of the Court's prior constructions. The parties dispute one term that was not previously construed.

The '608 patent is entitled "multifunction card system" and describes a system accessible from retail point-of-sale ("POS") terminals. According to Alexsam, the patented multifunction card system allows for the activation of a variety of cards and the use of gift, loyalty, medical information, and debit/medical services cards. The '608 patent explains that at the point of sale, a retailer has an existing POS device, such as a card swipe machine, cash register, or computer terminal. A gift card, loyalty card, or phone card has a magnetic strip, similar to a credit or debit card, with a card number encoded on the strip. The card number includes a bank identification number ("BIN") which the retailer's POS device is able to read. The novel aspect of the invention is the use of the BIN in connection with the card number to take advantage of existing POS devices. At the time of the application, existing POS terminals were pre-programmed to read bank identification numbers associated with two card issuing institutions. By incorporating a BIN into the card number, the inventor claims to have created a system that did not require the retailers to modify and pre-program their existing POS terminals.

The system allows the retail clerk to activate the cards at the point of sale and route the information to the processing hub which creates an account. When a user makes a card purchase, the system routes the data to a processing hub which compares the purchase price to the balance and issues an approval code back to the retailer and decrements the balance or declines the transaction if there is an insufficient balance on the card. The system also enables a user to re-charge the account balances. Finally, the system enables the use of "smart cards" which can

perform multiple functions (such as a gift certificate coupled with a pre-paid phone card).

The invention's primary purpose appears to have been to solve the problem of a "closed loop" system that was being used for phone cards at that time. The closed loop system required that a dedicated POS be installed in each retail location. By encoding a bank identification number into his cards, the inventor, Robert Dorf, was able make his cards work with existing standard retail POS devices without any need for modification to the POS. The Examiner forced the applicant to include both these limitations (the BIN and an unmodified POS) in the allowed claims. Auxiliary to the invention on phone cards, Dorf also added related inventions, namely, gift certificate cards, loyalty cards and debit/medical cards that would work with the same system.

The abstract of the '608 patent states:

> Disclosed is a multifunction card system which provides a multifunction card capable of serving as a prepaid phone card, a debit card, a loyalty card, and a medical information card. Each card has an identification number comprising a bank identification number which assists in establishing communications links. The card system can be accessed from any existing point-of-sale (POS) device. The POS device treats the card as a credit or debit card and routes transaction data to a processing hub using the banking system. The processing hub coordinates the various databases corresponding to the various functions of the card.

'608 Patent at Abstract.

### I.    General Principles Governing Claim Construction

"A claim in a patent provides the metes and bounds of the right which the patent confers on the patentee to exclude others from making, using or selling the protected invention." *Burke, Inc. v. Bruno Indep. Living Aids, Inc.*, 183 F.3d 1334, 1340 (Fed. Cir. 1999). Claim construction is an issue of law for the court to decide. *Markman v. Westview Instruments, Inc.*, 52 F.3d 967, 970-71 (Fed. Cir. 1995) (en banc), *aff'd*, 517 U.S. 370 (1996).

To ascertain the meaning of claims, the court looks to three primary sources: the claims,

the specification, and the prosecution history. *Markman*, 52 F.3d at 979. Under the patent law, the specification must contain a written description of the invention that enables one of ordinary skill in the art to make and use the invention. A patent's claims must be read in view of the specification, of which they are a part. *Id*. For claim construction purposes, the description may act as a sort of dictionary, which explains the invention and may define terms used in the claims. *Id*. "One purpose for examining the specification is to determine if the patentee has limited the scope of the claims." *Watts v. XL Sys., Inc.*, 232 F.3d 877, 882 (Fed. Cir. 2000).

Nonetheless, it is the function of the claims, not the specification, to set forth the limits of the patentee's claims. Otherwise, there would be no need for claims. *SRI Int'l v. Matsushita Elec. Corp.*, 775 F.2d 1107, 1121 (Fed. Cir. 1985) (en banc). The patentee is free to be his own lexicographer, but any special definition given to a word must be clearly set forth in the specification. *Intellicall, Inc. v. Phonometrics*, 952 F.2d 1384, 1388 (Fed. Cir. 1992). And, although the specification may indicate that certain embodiments are preferred, particular embodiments appearing in the specification will not be read into the claims when the claim language is broader than the embodiments. *Electro Med. Sys., S.A. v. Cooper Life Sciences, Inc.*, 34 F.3d 1048, 1054 (Fed. Cir. 1994).

This court's claim construction decision must be informed by the Federal Circuit's decision in *Phillips v. AWH Corporation*, 415 F.3d 1303 (Fed. Cir. 2005) (en banc). In *Phillips*, the court set forth several guideposts that courts should follow when construing claims. In particular, the court reiterated that "the *claims* of a patent define the invention to which the patentee is entitled the right to exclude." 415 F.3d at 1312 (emphasis added) (*quoting Innova/Pure Water, Inc. v. Safari Water Filtration Systems, Inc.*, 381 F.3d 1111, 1115 (Fed. Cir. 2004)). To that end, the words used in a claim are generally given their ordinary and customary

meaning. *Id*. The ordinary and customary meaning of a claim term "is the meaning that the term would have to a person of ordinary skill in the art in question at the time of the invention, i.e., as of the effective filing date of the patent application." *Id*. at 1313.  This principle of patent law flows naturally from the recognition that inventors are usually persons who are skilled in the field of the invention.  The patent is addressed to and intended to be read by others skilled in the particular art. *Id*.

The primacy of claim terms notwithstanding, *Phillips* made clear that "the person of ordinary skill in the art is deemed to read the claim term not only in the context of the particular claim in which the disputed term appears, but in the context of the entire patent, including the specification." *Id*.  Although the claims themselves may provide guidance as to the meaning of particular terms, those terms are part of "a fully integrated written instrument." *Id*. at 1315 (*quoting Markman*, 52 F.3d at 978).  Thus, the *Phillips* court emphasized the specification as being the primary basis for construing the claims. *Id*. at 1314-17.  As the Supreme Court stated long ago, "in case of doubt or ambiguity it is proper in all cases to refer back to the descriptive portions of the specification to aid in solving the doubt or in ascertaining the true intent and meaning of the language employed in the claims." *Bates v. Coe*, 98 U.S. 31, 38 (1878).  In addressing the role of the specification, the *Phillips* court quoted with approval its earlier observations from *Renishaw PLC v. Marposs Societa' per Azioni*, 158 F.3d 1243, 1250 (Fed. Cir. 1998):

> Ultimately, the interpretation to be given a term can only be determined and confirmed with a full understanding of what the inventors actually invented and intended to envelop with the claim.  The construction that stays true to the claim language and most naturally aligns with the patent's description of the invention will be, in the end, the correct construction.

Consequently, *Phillips* emphasized the important role the specification plays in the claim

construction process.

The prosecution history also continues to play an important role in claim interpretation. The prosecution history helps to demonstrate how the inventor and the PTO understood the patent. *Phillips*, 415 F.3d at 1317. Because the file history, however, "represents an ongoing negotiation between the PTO and the applicant," it may lack the clarity of the specification and thus be less useful in claim construction proceedings. *Id*. Nevertheless, the prosecution history is intrinsic evidence. That evidence is relevant to the determination of how the inventor understood the invention and whether the inventor limited the invention during prosecution by narrowing the scope of the claims.

*Phillips* rejected any claim construction approach that sacrificed the intrinsic record in favor of extrinsic evidence, such as dictionary definitions or expert testimony. The *en banc* court condemned the suggestion made by *Texas Digital Systems, Inc. v. Telegenix, Inc.*, 308 F.3d 1193 (Fed. Cir. 2002), that a court should discern the ordinary meaning of the claim terms (through dictionaries or otherwise) before resorting to the specification for certain limited purposes. *Id*. at 1319-24. The approach suggested by *Texas Digital*–the assignment of a limited role to the specification–was rejected as inconsistent with decisions holding the specification to be the best guide to the meaning of a disputed term. *Id*. at 1320-21. According to *Phillips*, reliance on dictionary definitions at the expense of the specification had the effect of "focus[ing] the inquiry on the abstract meaning of words rather than on the meaning of the claim terms within the context of the patent." *Id*. at 1321. *Phillips* emphasized that the patent system is based on the proposition that the claims cover only the invented subject matter. *Id.* What is described in the claims flows from the statutory requirement imposed on the patentee to describe and particularly claim what he or she has invented. *Id.* The definitions found in dictionaries, however, often flow from the

editors' objective of assembling all of the possible definitions for a word. *Id*. at 1321-22.

*Phillips* does not preclude all uses of dictionaries in claim construction proceedings. Instead, the court assigned dictionaries a role subordinate to the intrinsic record. In doing so, the court emphasized that claim construction issues are not resolved by any magic formula. The court did not impose any particular sequence of steps for a court to follow when it considers disputed claim language. *Id*. at 1323-25. Rather, *Phillips* held that a court must attach the appropriate weight to the intrinsic sources offered in support of a proposed claim construction, bearing in mind the general rule that the claims measure the scope of the patent grant.

The parties dispute whether the patent-in-suit includes a claim limitation that falls within the scope of 35 U.S.C. § 112 ¶ 6. "An element in a claim for a combination may be expressed as a means or step for performing a specified function without the recital of structure. . . in support thereof, and such claim shall be construed to cover the corresponding structure . . . described in the specification and equivalents thereof." 35 U.S.C. § 112 ¶ 6. When a claim uses the term "means" to describe a limitation, a presumption inheres that the inventor used the term to invoke § 112 ¶ 6. *Biomedino, LLC v. Waters Techs. Corp.*, 490 F.3d 946, 950 (Fed. Cir. 2007). "This presumption can be rebutted when the claim, in addition to the functional language, recites structure sufficient to perform the claimed function in its entirety." *Id.* (citing *Altiris, Inc. v. Symantec Corp.*, 318 F.3d 1363, 1375 (Fed. Cir. 2003)). Once the court has concluded the claim limitation is a means-plus-function limitation, the first step in construing a means-plus-function limitation is to identify the recited function. *See Micro Chem., Inc. v. Great Plains Chem. Co.*, 194 F.3d 1250, 1258 (Fed. Cir. 1999). The second step in the analysis is to identify in the specification the structure corresponding to the recited function. *Id.* The "structure disclosed in the specification is 'corresponding' structure only if the specification or prosecution history

clearly links or associates that structure to the function recited in the claim." *Medical Instrumentation and Diagnostics Corp. v. Elekta AB*, 344 F.3d 1205, 1210 (Fed. Cir. 2003), *citing B. Braun v. Abbott Labs*, 124 F.3d 1419, 1424 (Fed. Cir. 1997).

The patentee must clearly link or associate structure with the claimed function as part of the quid pro quo for allowing the patentee to express the claim in terms of function pursuant to § 112 ¶ 6. *See id.* at 1211; *see also Budde v. Harley-Davidson, Inc.*, 250 F.3d 1369, 1377 (Fed. Cir. 2001). The "price that must be paid" for use of means-plus-function claim language is the limitation of the claim to the means specified in the written description and equivalents thereof. *See O.I. Corp. v. Tekmar Co.*, 115 F.3d 1576, 1583 (Fed. Cir. 1997). "If the specification does not contain an adequate disclosure of the structure that corresponds to the claimed function, the patentee will have 'failed to particularly point out and distinctly claim the invention as required by the second paragraph of section 112,' which renders the claim invalid for indefiniteness." *Blackboard, Inc. v. Desire2Learn, Inc.*, 574 F.3d 1371, 1382 (Fed. Cir. 2009), *quoting In re Donaldson Co.*, 16 F.3d 1189, 1195 (Fed. Cir. 1994) (en banc). It is important to determine whether one of skill in the art would understand the specification itself to disclose the structure, not simply whether that person would be capable of implementing the structure. *See Atmel Corp. v. Info. Storage Devices, Inc.*, 198 F.3d 1374, 1382 (Fed. Cir. 1999); *Biomedino*, 490 F.3d at 953. Fundamentally, it is improper to look to the knowledge of one skilled in the art separate and apart from the disclosure of the patent. *See Medical Instrumentation*, 344 F.3d at 1211-12. "[A] challenge to a claim containing a means-plus-function limitation as lacking structural support requires a finding, by clear and convincing evidence, that the specification lacks disclosure of structure sufficient to be understood by one skilled in the art as being adequate to perform the recited function." *Budde*, 250 F.3d at 1376-77.

**II.     Agreed Terms**

| Term/Phrase | Agreed Construction |
|---|---|
| Activating an account | Make an account functional for use |
| Bank processing hub computer | A computer, other than a processing hub, that is maintained by a bank, that facilitates the card transaction and that is remote from the pre-existing standard retail point-of-sale device |
| Communication | The process of exchanging information |
| Corresponding to | "Corresponding to" needs no construction, but if a construction is required, it means agreeing to, conforming to, consistent to or analogous to |
| Electronic gift certificate card | A prepaid card that operates through an exchange of electronic signals and that can be used in lieu of cash |
| Gift certificate card account balance | A prepaid amount of funds available for use by a user of the electronic gift certificate card |
| Means for activating an account corresponding to the electronic gift certificate card with a balance equal to the electronic gift certificate activation amount | The specification teaches that "[u]pon receipt of the transaction data, the hub 103 recognizes the card 101 as being an Electronic Gift Certificate card of the retail issuer and activates or recharges the card 101 in the appropriate amount in an EGC database 205 maintained by the processing hub." '608 patent, col. 7, ll. 65-col. 8, ll. 2. The means for activation is the processing hub 103. |
| Means for activating an account corresponding to the phone card with a balance equal to the phone card activation amount | This limitation is found in claim 9 of the '608 patent. The specification states "[w]hen the issuer hub 104 receives the data from the processing hub 103, it activates the record ...." '608 patent, col. 7, ll. 15-16. The corresponding structure is therefore the phone card issuer hub 104. |
| Means for allowing a user of the electronic gift certificate card to purchase goods and services .... | The corresponding structure is the processing hub which issues the approval code. '608 patent, col. 8, ll. 25-28. |
| Means for decreasing the balance of the account corresponding to the electronic gift certificate card .... | The corresponding structure is the processing hub. '608 patent, col. 8, ll. 25-27 ("If the balance is greater than the purchase amount, the processing hub will decrement the record in the database") |

| | |
|---|---|
| Means for decreasing the balance of the account corresponding to the phone card by the value of the long distance telephone calling time obtained | The corresponding structure linked to the decreasing function is the phone card issuer hub 104. '608 patent, col. 8, ll. 67-col. 9, ll. 1-3 ("[w]hen the call terminates, the phone card issuer hub 104 decrements the appropriate record in its phone card database 204 and instructs the processing hub to do the same in the ECG database 205.") |
| Means for increasing the balance of the account corresponding to the phone card by the phone card recharge amount | The corresponding structure is the phone card issuer hub 104. |
| Means for allowing a user of the electronic gift certificate card to obtain long distance telephone calling time .... | The corresponding structure is described in the patent as the prepaid phone card issuer hub 104. '608 patent, col. 8, ll. 54-57; col. 7, ll. 13-22. |
| Multifunction card system | This phrase is in the preamble, so it does not need to be construed. If any construction is needed, it means a card system that can serve a number of functions. |
| Prepaid card | Where in the preamble, "prepaid card" does not need to be construed. If any construction is needed, it means a card that requires a prepaid amount before it can be used. |
| Recharge | Purchase value for a previously activated card |
| Transaction Processor | A computer, other than a processing hub, that facilitates the card transaction and that is remote from the unmodified existing standard retail point-of-sale device |
| Unmodified existing standard retail point-ofsale device | A terminal for making purchases at a retail location of the type in use as of July 10, 1997 that has not been reprogrammed, customized, or otherwise altered with respect to its software or hardware for use in the card system |
| Wherein said total value of goods and services purchased and long distance telephone calling time obtained using said gift certificate card cannot exceed said gift certificate card account balance | The claim language requires the gift certificate card to be able to act as a prepaid phone card and be able to purchase goods or services. |
| Phone Card | A card with a unique identification number having, upon activation, a specific purchase amount usable only to make telephone calls |

10

### III.     Disputed Terms

### A.  Activation Amount

| **Claim Term:** "activation amount"[4] | |
|---|---|
| **Alexsam's Proposal:** "a value used to establish the total value of goods or services that the user may obtain upon the prepaid account being made functional for use" | **IDT's Proposal:** "the total value of goods or services that the user may obtain upon the prepaid account being made functional for use" |

The Court construed this term in the Datastream Markman Order. Alexsam asks the Court to modify its prior construction because it does not reflect all disclosed embodiments. After considering Alexsam's arguments, the Court agrees. *See Oatey Co. v. IPS Corp.*, 514 F.3d 1271, 1276–77 (Fed. Cir. 2008) ("We normally do not interpret claim terms in a way that exclude embodiments disclosed in the specification.").

The specification discloses an embodiment in which a card is activated with an amount different than the total value of the card. For example, when a phone card is activated, the vendor will conduct a transaction with a nominal amount in order to comply with banking regulations. The amount of the transaction is significantly less than the value of the card, but may correspond to or be keyed to the total card value. '608 patent, 5:49–6:4. Alexsam argues that this nominal amount is an "activation amount."

Moreover, the claim language indicates that the patentee envisioned that an activation amount could be different than the total card value. For example, claim 34 of the '608 patent shows that the card balance need not be equal to the activation amount. *See* '608 Patent, claim 34 ("a balance corresponding to the electronic gift certificate activation amount").

IDT argues that "nominal amounts" and activation amounts are distinct concepts. According to IDT, the nominal amount relates to the transaction amount and not the card value. IDT also argues that Alexsam is collaterally estopped from advancing this argument because the

Court previously rejected the same argument in Datastream. To prevail on the theory of collateral estoppel, a party must show the following: "(1) the issue is identical to one decided in the first action; (2) the issue was actually litigated in the first action; (3) resolution of the issue was essential to a final judgment in the first action; and (4) plaintiff had a full and fair opportunity to litigate the issue in the first action." *In re Freeman*, 30 F.3d 1459, 1465 (Fed. Cir. 1994); *see also U.S. v. Shanbaum*, 10 F.3d 305, 311 (5th Cir. 1994) (setting forth a similar test). In the Datastream Markman order, the Court did not expressly reject Alexsam's argument that the activation amount can be the nominal transaction amount. Moreover, the arguments that the Court considered in the Datastream Markmen Order were not identical to the current arguments. Alexsam's present argument is persuasive in light of the reliance on the claim language "corresponding to," which suggests that "activation amount" could be broader than the value of the card. "A patentee may claim an invention broadly and expect enforcement of the full scope of that language absent a clear disavowal or contrary definition in the specification." *Home Diagnostics, Inc. v. LifeScan, Inc.*, 381 F.3d 1352, 1357 (Fed. Cir. 2004). *See also Gillete Co. v. Energizer Holdings, Inc.*, 405 F.3d 1367, 1371 (Fed. Cir. 2005) ("[A] patentee typically claims broadly enough to cover less preferred embodiments as well as more preferred embodiments, precisely to block competitors from marketing less than optimal versions of the claimed invention."). The Court construes "activation amount" to mean "a value used to establish the total value of goods or services that the user may obtain upon the prepaid account being made functional for use."

### B. Approval Code

| **'787 Patent, Claim 23(e) Term:** "approval code" | |
|---|---|
| **Alexsam's Proposal:** the Court should adopt the definition provided in section 34 of its Datastream Claim Construction Order" (*i.e.*, "a code that will allow a transaction to proceed") | **IDT's Proposal:** "a code that will allow a transaction to proceed if a purchase amount is less than the account balance" |

IDT seeks to narrow the Court's previous construction for "approval code" in the Datastream Markman Order. This term appears in claim 23 of the '787 patent.

IDT argues that "approval code" is defined narrowly by the same claim limitation in which it appears. According to IDT, "the only way that the transaction can be authorized to proceed is if the purchase amount is less than the card balance." Def. Br. at 11. The Court is not persuaded by IDT's argument. If the Court were to includes the conditional "if a purchase amount is less than the account balance" in the definition of "approval code," then the remainder of the claim limitation ("if said purchase amount is less than or equal to gift certificate card account balance") would be superfluous. Furthermore, an approval code could be transmitted for transactions provided that the balance has at least some value, rather than merely a value greater than the transaction amount. The Court retains its prior construction.

### C. Bank Identification Number Approved by the American Banking Association for Use in a Banking Network

| **Claim Term:** "bank identification number approved by the American Banking Association for use in a banking network" | |
|---|---|
| **Alexsam's Proposal:** the Court should adopt the definition provided in section 2 of its Datastream Claim Construction Order" (*i.e.*, "a numeric code which identifies a card-issuing financial institution and that is sanctioned by the American Bankers Association") | **IDT's Proposal:** "a numeric code that uniquely identifies a card-issuing financial institution and is a Card Issuer Identification Number found in the ISO Register of Card Issuer Identification Numbers produced by the American Banker's Association in its capacity as the ISO/IEC 7812 Registration Authority" |

IDT asks the Court to modify its previous construction. This term appears in every independent claim. IDT argues that this term should be narrowed in order to explain "how a BIN

13

approved by the ABA allows the invention of the patents-in-suit to work with existing POS devices." Def. Br. at 13. IDT has not shown any error in the Court's prior construction. The Court retains its prior construction.

### D. Banking Network

| **Claim Term:** "banking network" | |
|---|---|
| **Alexsam's Proposal:** the Court should adopt the definition provided in section 9 of its Datastream Claim Construction Order" *(i.e.*, "a set of interconnected computers used by banks and financial institution for purposes of conducting and processing financial transactions") | **IDT's Proposal:** "terminals, computers, and processors of multiple banks, issuers, and third-party processors that are linked together for the purpose of processing financial transactions, and which incorporates and utilizes a bank processing hub" |

IDT asks the Court to modify its previous construction for "banking network," which appears in many of the asserted claims. IDT relies on the prosecution history, during which the patentee argued that "a banking network necessarily, by virtue of its being a banking network, incorporates and utilizes a banking processing hub." *See* Def. Br. at 14. IDT identifies no error in the Court's prior construction, but its argument is nonetheless persuasive. However, the Court disagrees that the banking network necessarily includes a *bank* processing hub. *See* '608 Patent, Fig. 2 (processing hub 103 includes three different databases; databases of this type would not ordinarily be found in a bank processing hub). *See also* '608 patent, 5:4–8 (indicating clearly that the processing hub of the invention is not limited to a bank processing hub). Databases of The Court construes "banking network" to mean "a set of interconnected computers used by banks and financial institution for purposes of conducting and processing financial transactions, and which incorporates and utilizes a processing hub."

### E. Means for Receiving Electronic Gift Certificate Card Activation Data from an Unmodified Existing Standard Retail Point of Sale Device when said Electronic Gift Certificate Card is Swiped through the Point of Sale Device . . .

| '608 Patent, Claim 1(b): "Means for receiving electronic gift certificate card activation data from an unmodified existing standard retail point of sale device when said electronic gift certificate card is swiped through the point of sale device ...." ||
|---|---|
| **Alexsam's Proposal:** the Court should adopt the definition provided in section 15 of its Datastream Claim Construction Order" (*i.e.*, "the court identifies the specific, alternative, combinations of structure which form the pathways for receiving the data from the POS device. These include the various combinations of the retailer processors, the bank processors, the debit network, and the processing hub as shown in Figure 2. '608 patent, Fig. 2") | **IDT's Proposal:** "The corresponding structures are the various combinations of the retailer processors, the bank processor, the debit network, and the processing hub as shown in Figure 2. '608 patent, Fig. 2." |

The parties agree to the function of this means-plus-function term, but dispute where the structure may be found. Both parties are relying on the Datastream Markman Order. Alexsam has included a preceding sentence from the Court's Datastream order in its identification of structure. IDT's proposal does not include that sentence. A portion of the lead-in sentence is necessary to give context to the Court's construction. The Court construes this term to mean "The corresponding structures include the pathways for receiving the data from the POS device, which include the various combinations of the retailer processors, the bank processor, the debit network, and the processing hub as shown in Figure 2, and equivalents thereof."

### F. Phone Card Activation Amount

| '787 Patent, Claim 14: "phone card activation amount" ||
|---|---|
| **Alexsam's Proposal:** "a value used to establish the total value of telephone services that a user may obtain upon the prepaid phone card being made functional for use" | **IDT's Proposal:** "the total value of telephone services that the user may obtain upon the prepaid phone card being made functional for use" |

Alexsam repeats its previous argument for "activation amount" in its proposal for "phone

card activation amount." The parties agree that "phone card activation amount" should be construed in the same manner as "activation amount." The Court construes "phone card activation amount" to mean "a value used to establish the total value of goods or services that the user may obtain upon the prepaid phone card being made functional for use."

### G. Phone Card Computer under Phone Card Software Control

| **'787 Patent, Claim 14:** "phone card computer under phone card software control" ||
|---|---|
| **Alexsam's Proposal:** the Court should adopt the definition provided in section 30 of its Datastream Claim Construction Order" (*i.e.*, "a computer that processes data related to multiple phone cards and their accounts") | **IDT's Proposal:** "a computer that processes data related to multiple phone cards and their accounts **as directed by software**" |

The Court previously construed the "phone card computer," but declined to construe "under phone card software control." IDT asks the Court to construe the entire limitation, but identifies no error in the prior construction. The Court retains its prior construction. "Phone card computer under phone card software control" means "a computer that processes data related to multiple phone cards and their accounts."

### H. Pre-Existing Standard Retail Point-of-Sale Device

| **Claim Term:** "pre-existing standard retail point-of-sale device" ||
|---|---|
| **Alexsam's Proposal:** the Court should adopt the definition provided in section 28 of its Datastream Claim Construction Order" (*i.e.*, "a terminal for making purchases at a retail location of the type in use as of July 10, 1997") | **IDT's Proposal:** "a retail device, such as a stand-alone point-ofsale terminal, cash register with point-of- sale interfacing, computer with point-of-sale interfacing, other similar terminal for making purchases at a retail location of the type in use as of July 10, 1997" |

IDT asks the court to add more detail to the Court's construction for "pre-existing standard retail point-of-sale device." IDT argues that the patentee acted as his own lexicographer when the specification says, "the system 108 uses existing banking networks in a unique and novel way to gain access to virtually all existing retail point-of-sale (POS) devices 105. These devices 105 include stand-alone POS terminals, cash registers with POS interfacing, computers with POS

interfacing, and other similar devices which can be used to access the banking system. As used herein, POS device includes all such devices, whether data entry is effected by swiping a card through the device or by manual entry." '608 Patent, 4:26–35. IDT does not argue that the prior construction is inconsistent with the allegedly explicit definition in the specification. The Court retains its prior construction and construes this term to mean "a terminal for making purchases at a retail location of the type in use as of July 10, 1997"

### I. Processing Hub

| **Claim Term:** "processing hub" ||
|---|---|
| **Alexsam's Proposal:** the Court should adopt the definition provided in section V(5) of the Humana Claim Construction Order (*i.e.*, "a computer which provides front-end POS device management and message processing for card authorizations") | **IDT's Proposal:** "a computer which provides front-end point of sale device management and message processing for card authorizations and activations" |

The Court construed this term in both the Humana and Datastream Markman orders. IDT asks the Court to revert to its construction in the Datastream Markman Order while Alexsam urges the Court to retain the construction adopted in the Humana Markman Order.

In the Datastream Order, the Court previously found that the '608 patent specification provided a definition of the "processing hub" as used in this invention. *See* Datastream Markman Order at 10. The Court, therefore, adopted the definition for this term as recited in the specification. *Id*. In the Humana Markman Order, the Court broadened the construction for "processing hub" by omitting "and activations," explaining that not all of the claims then asserted required activation. *See* Humana Markman Order at 15.

IDT argues that all of the claims now asserted require activation and the Court should revert to the Datastream order. The Court is not persuaded by this argument. Claim terms should have the same meaning across in all claims, mandating the Court keep the broadest possible definition. The Court does find that a processing hub could perform activations without performing

17

authorizations. The Court construes the term to mean, "a computer which provides front-end point of sale device management and message processing for card authorizations or activations."

**J. Swiping**

| **Claim Term:** "swiping" | |
|---|---|
| **Alexsam's Proposal:** the Court should adopt the definition provided in section 13 of its Datastream Claim Construction Order" (*i.e.*, "passing or sliding a card through an electronic card reader") | **IDT's Proposal:** "sliding a card with a magnetically encoded stripe through a magnetic stripe reader" |

IDT asks the Court to limit swiping to the narrow purpose of reading the magnetic stripe on a card. IDT argues that the Court's prior construction "encompasses a litany of products that bear no relation to the patens-in-suit or the subject matter that they were attempting to cover. For instance, the Court's construction of 'swiping' requires no physical contact between the card and the reader." Def. Br. at 23. The Court previously rejected a definition that is identical to IDT's proposal. IDT introduces no new arguments in favor of its proposal. The Court retains its prior construction and construes this term to mean "passing or sliding a card through an electronic card reader."

**K. Unique Identification Number**

| **Claim Term:** "unique identification number" | |
|---|---|
| **Alexsam's Proposal:** This language does not need to be construed. If any construction is needed, the Court should construe the term to mean "a one of a kind identification number." | **IDT's Proposal:** "a one of a kind identification number **comprising a bank identification number approved by the American Banker's Association for use in a banking network**" |

The Court has not construed this term. In claim 1, the relevant limitation reads, "at least one electronic gift certificate card having a unique identification number encoded on it, said identification number comprising a bank identification number approved by the American Banking Association for use in a banking network." '608 patent, Claim 1.

The parties agree that a "unique identification number" is "a one of a kind identification number." IDT argues that the number must be limited by the additional language for the same

18

reasons urged in its argument for "bank identification number." IDT's construction is incorrect because it makes the rest of the claim limitation superfluous. The Court construes the term to mean "a one of a kind identification number."

### IV.     Conclusion

The court adopts the constructions set forth in this opinion for the disputed terms of the '608 and '787 patents. The parties are ordered that they may not refer, directly or indirectly, to each other's claim construction positions in the presence of the jury. Likewise, the parties are ordered to refrain from mentioning any portion of this opinion, other than the actual definitions adopted by the court, in the presence of the jury. Any reference to claim construction proceedings is limited to informing the jury of the definitions adopted by the court.

SIGNED this 29th day of June, 2010.

_____
T. JOHN WARD
UNITED STATES DISTRICT JUDGE